IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

     Plaintiff,     Criminal No. 19-CR-10104-ADB

 vs.

STEPHAN ROSSER-STEWART,

     Defendant.

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The government opposes the defendant's motion to suppress. In the aftermath of a violent armed robbery, a high speed chase through a residential neighborhood, and multiple gunshots fired at police during that chase, there was ample basis to stop the defendant in order to determine if he was one of the robbers. The defendant matched the five-point (race, sex, height, clothing, hair style) description that had been provided to police by the victim and a cooperating suspect. Moreover, the defendant was observed walking only a short distance from the getaway car, sweating profusely on a below-freezing night, about thirty minutes after the getaway car was abandoned. Beyond that, the defendant's answers to the officer's questions did not make sense. As such, there was sufficient grounds to stop the defendant, and the defendant was promptly identified by the cooperating suspect with minutes and, the defendant's motion should be denied.

## FACTUAL BASIS RELATED TO THE MOTION TO SUPPRESS

On January 26, 2019, at 7:13 P.M., G.D., the store manager of the T-Mobile at 521 Belmont Street in Brockton, MA, called 911 to report an armed robbery. See Exs. 1 (transcript

of 911 recording), 2, 3 6 (Brockton turret tape).[1]  G.D. reported that four black males had guns,

struck him in the head and took most of his iPhones.  See Exs. 1, 6.[2]  G.D. did not see a vehicle,

but reported that the men were wearing hoodies.  See Exs. 1, 6. Unbeknownst to the thieves, they

also had taken a fake iPhone that was a tracking device.  See Exs. 1, 3, 6.

Two minutes later, at 7:15 P.M., the security company responsible for the tracking device

called Brockton Police and reported the live location of the tracking device to the officers.  See

Ex. 6 (Turret tape: 19.15.03).[3]  By 7:18 P.M., responding officers were reporting that they had

identified the suspect vehicle as a white Chevrolet Malibu, and when the vehicle refused to stop,

gave chase. See Ex. 3, 6 (19.18.21, 19:18:50).  At 7:19 P.M., officers reported they were in

pursuit, on Lyman Street, then onto Wendell Avenue, Addison Street heading west, then Sprague

Street, Pine Street, and ultimately onto Summer Street. See Ex. 6 (19.19.11). As they got onto

Summer Street, the officer reported the speed to be over 60 mph. See Ex. 3, 6 (19.19.11).

While heading South on Summer Street, Officer Sylverson Robinson reported shots being

fired at him from the white Chevrolet Malibu.  See Exs. 3, 6 (19.19.11).  The Malibu took a left

on Edson Street, then a right onto Carl Avenue (an area of single family homes), at which point

---

[1] The government has redacted information that would tend to identify the victim by full name, and a cooperating witness.  The government also notes that the Officer Quirk's report inaccurately describes the content of the store surveillance video on pages 2 and 3.  Specifically, the report confuses the suspect descriptions and lists Darius Carter as wearing purple medical gloves, and Rosser-Stewart wearing white gloves dotted with black dots; the surveillance video reveals that Darius Carter, in all black, was wearing the white gloves, while Rosser-Stewart, in jeans, wore white gloves.  Compare Ex. 2 to Ex. 3.

[2] In fact, only three men entered the store, but the involvement of a fourth was later confirmed by a cooperating suspect.  See Ex. 2, 3, 6 (19.47.56).

[3] The government has provided the turret tapes of Brockton Police for this incident.  See Ex. 6.  The Brockton turret tape is separated into individual files for each radio communication, with the file name stating the time of the transmission.  References to these transmissions are by the 24-hour time format stated in the file name.

the occupants bailed out and headed west onto Baker Street on foot. See Exs. 3, 5, 6 (19.19.11).
The white Malibu was abandoned at the intersection of Carl Avenue and Bristol Avenue and
contained substantial evidence tying it to the robbery.  See Exs. 3, 6 (19.26.46).  Numerous
officers and departments assisted with the search for the suspects.

The first suspect to be arrested was Darius Carter who was taken into custody at
approximately 7:30 P.M. in the woods southwest from 44 Baker Street.  See Exs. 3, 5, 6
(19.30.42).  At approximately 7:32 P.M., the second suspect -- the cooperating suspect – was
arrested in the area of 44 Baker Street.  See Exs. 3, 6 (19.33.33).  Both were located near the
abandoned Malibu, and a short distance from Carl Avenue.  See Exs. 3, 5 (map of area around
Carl Avenue).

One of the arrested suspects began cooperating and providing information to the police
that was broadcast over the radio, confirming first at 7:48 P.M. that there were four suspects
involved in the robbery.  See Ex. 6 (19.47.56).  As the search continued on, at 7:57 P.M., a
further description of the two remaining suspects, provided by the cooperating suspect was
broadcast over the radio: "one of the males is gonna be described having long braids, about 5',
8"… 6 feet medium build, dark complexion; possibly named earl. And the second suspect is
gonna be over six feet, light skinned with a long beard."  See Exs. 1, 6 (19.57.37).

By this time, Troopers of the Massachusetts State Police (MSP) had come to assist the
Brockton Police.  See Ex. 4 (MSP report). MSP Trooper Eric Resendes, in uniform and a marked
cruiser, was one of the responding officers who assisted with the search.  See Ex. 4.[4]  Resendes

---

[4] The government anticipates eliciting testimony that Trooper Resendes's cruiser is
equipped with a scanner capable of receiving broadcasts from local police departments, but not
able to transmit.  The government further anticipates eliciting testimony that on this evening,
once he went to assist with the search, he was listening to the Brockton Police broadcasts.

knew that two suspects had been located near Carl Avenue and was on the lookout for the two remaining suspects.  See Ex. 5, 6.  Resendes also knew from broadcasts that no firearms had been recovered, suggesting the suspects were still armed and willing to shoot.  See Ex. 6 (19.49.28) ("we have two in custody, we know for a fact there's two in the wind, and three weapons. No weapons recovered, we did recover some ammunition.").

Around 8:00 P.M., Resendes observed the defendant walking across on Carl Avenue and up onto the front steps of a residence, about one-quarter of a mile, or 1400 feet away from where the vehicle was abandoned.  See Exs. 4, and 5 (map).   The government anticipates eliciting testimony that the defendant was the only pedestrian that Resendes observed while searching for the suspects.  As he got closer, Resendes could see the defendant matched the suspect description: he was a dark complexioned black male, on foot, wearing a hoodie, five foot, eleven inches tall, with braids.  See Exs. 3, 4.  Moreover, it was dark and 27 degrees out, and the defendant was not wearing a jacket.  See Ex. 3 (Brockton Police report).   Notwithstanding all this, the defendant was "sweating profusely." See Ex. 3 (page 2).

Trooper Resendes stopped his cruiser in front of the house, rolled down his window, and asked the defendant if he lived there.  See Ex. 4.  The defendant responded no, and Resendes got out of his cruiser and approached him. See Ex. 4.  Resendes, whose gun remained holstered,[5] gave no command to the defendant, but merely asked the defendant what he was doing at the house.  The defendant replied, "me and my girlfriend got into a fight, and she had me get out of the car," "I'm trying to get back home," which he said was in Boston.  See Ex. 4.

---

[5] The defendant does not contend otherwise.  Cf. ECF #75-1.

Resendes then pat-frisked the defendant and placed him in handcuffs, explaining that he was not under arrest, but would be detained until Resendes could determine if he was involved in the armed robbery.  See Ex. 4.  Resendes had the defendant sit in the cruiser, and asked for his name and date of birth, which were transmitted to dispatch. See Exs. 4.  Dispatch then informed Resendes that the defendant had multiple prior felony entries, including armed robbery, and firearms charges. See Ex. 4.

Brockton Police officer Matthew Farrell responded to Resendes' location and took a picture of Rosser-Stewart that he sent to Det. Lopez, who was with cooperating suspect.  See Ex. 3 (pages 8, 12), 4, 6 (20.06.25) (noting the defendant matches the description).  The cooperating suspect then positively identified Rosser-Stewart as being involved in the robbery, and he was placed under arrested at roughly 8:10 P.M.  See Exs. 3, 4, 6.

During the robbery, the defendant bent over while placing stolen phones into the duffel bag, exposing his distinct pink/purple underpants.  See Ex. 2. During booking at the station hours later, the booking video captures the defendant lifting up his shirt and revealing the same distinctive pink/purple underpants.  See Ex. 7.  Once arraigned in Brockton District Court, the defendant was held without bail and detained at the Plymouth County House of Correction, where the jeans, sneakers and pink/purple underpants were held by the jail in the defendant's prisoner property.  See 19-MJ-4103-DHH (affidavit, search warrant).  These pink/purple underpants were seized by ATF on February 20, 2019, pursuant to a search warrant executed at the Plymouth County House of Correction.  See 19-MJ-4103-DHH.

## DEFENDANT'S MOTION TO SUPPRESS

The defendant's motion seeks to suppress "all evidence recovered as a result of the stop ant seizure of his person," including "physical evidence, statements and a photograph taken of

him during his unlawful detention as well as any resulting identification of the defendant

pursuant to that photograph."  D.Mot. 1.[6]  Specifically, the defendant claims that Resendes

lacked reasonable articulable suspicion to stop the defendant.  See D.Mot 1.  The defendant

offers a slightly different version of facts, via affidavit, that Trooper Resendes approached him

and directed him to leave the steps of the property.  See D.Mot. 5.

## ARGUMENT

I. **THERE WAS PROBABLE CAUSE TO ARREST AND REASONABLE SUSPICION TO DETAIN THE DEFENDANT AT THE MOMENT HE WAS OBSERVED BY TROOPER RESENDES; THE DETENTION WAS EXCEEDINGLY BRIEF BEFORE HE WAS POSITIVELY IDENTIFIED BY THE COOPERATING SUSPECT**

The seizure of the defendant was more than justified.  Here, the police were responding

to an incident where shots were fired at officers, and multiple suspects were at large.  The

defendant matched the five-point description of the suspects provided by the victim and a

cooperating suspect, and he was found a short distance from where the abandoned vehicle and

the other two suspects were apprehended.  Based upon all that was known to the officers, there

was clearly reasonable suspicion and indeed probable to arrest based upon the description, timing

and proximity to the abandoned vehicle, and circumstances of his walking down the street.

A. **The Collective Knowledge Doctrine Applies: Trooper Resendes Is Imputed to Know of the Description Broadcast at 7:57 P.M. by Brockton Police**

Governing precedent in this Circuit makes clear that "the 'collective knowledge'

principle [applies] when reviewing the existence of probable cause" and reasonable suspicion.

---

[6] In his motion, the defendant does not identify the booking video taken after arrest, or the pink/purple underpants that were seized nearly a month after the arrest as evidence he is seeking to suppress.  Cf. D.Mot. 1, 10.  In the event that the defendant claims these items are subject to suppression, the government would additionally argue that these items are not fruit of the poisonous tree, and are attenuated from any claimed seizure.

United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017), cert. denied, 138 S. Ct. 2593 (2018); Illinois
v. Andreas, 463 U.S. 765, 771 n.5 (1983) ("[W]here law enforcement authorities are cooperating
in an investigation ... the knowledge of one is presumed shared by all.").[7]   Under that doctrine,
this Court will thereby "look to the collective information known to the law enforcement officers
participating in the investigation rather than isolate the information known by the individual
arresting officer." Id.[8]

Here, of course, Resendes was specifically assisting with Brockton Police's search for the
suspects and responding to the public safety risk posed by the suspects.  The information relayed
to the dispatcher by the victim and the cooperating suspect is considered known to all of the
officers at the time of the stop, even if not specifically conveyed to the officers at the scene.  See
Torry v. City of Chicago, 932 F.3d 579, 586 (7th Cir. 2019) ("[W]hen officers are in
communication with each other while working together at a scene, their knowledge may be
mutually imputed even when there is no express testimony that the specific or detailed
information creating the justification for a stop was conveyed."); see also, United States v. Rowe,
878 F.3d 623, 628 (8th Cir. 2017) (requiring only "some degree of communication" to impute

---

[7] See United States v. Barnes, 506 F.3d 58, 63 (1st Cir. 2007) ("[R]easonable suspicion
can be imputed to the officer conducting a search if he acts in accordance with the direction of
another officer who has reasonable suspicion."); United States v. Meade, 110 F.3d 190, 193 (1st
Cir. 1997) (discussing the "fellow-officer/collective-knowledge rule").

[8] See also United States v. Hensley, 469 U.S. 221, 232 (1985); United States v. Cook,
277 F.3d 82, 86 (1st Cir. 2002) ("Where law enforcement officers are jointly involved in
executing an investigative stop, the knowledge of each officer should be imputed to others
jointly involved in executing the stop"); Morelli v. Webster, 552 F.3d 12, 17 (1st Cir. 2009)
("The pooled knowledge doctrine, sometimes known as the collective knowledge doctrine, is a
mechanism that in some circumstances allows a court to 'impute' facts known by one police
officer to another police officer engaged in a joint mission"); Burns v. Loranger, 907 F.2d 233,
236 n. 7 (1st Cir.1990); United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999)
(explaining that when reviewing probable cause "the focus is upon the collective knowledge
possessed by, and the aggregate information available to, all the officers involved in the
investigation").

collective knowledge of all law enforcement to an officer on the scene), cert. denied, 138 S. Ct. 1602 (2018).  As such, the collective knowledge doctrine imputes to Resendes all of the information known to police at the time provided by: (1) the victim, that the suspect was a black male wearing a hooded sweatshirt; (2) the officer who was shot at, that the offenders were on foot after abandoning the car at a location less than 1500 feet from where Resendes first encountered the defendant; (3) other officers, that two of the four suspects had been apprehended nearby; and (4) the cooperating suspect, that one of the suspects had braids and was between 5'8" and 6' tall.  See Exs. 3, 4, 6.  All these sources of information were percipient to the crime and were properly considered by the officers.[9]

## B. The Defendant Was Not Seized Until He Was Frisked, Placed in Handcuffs and Detained in the Cruiser

The defendant was not seized in the Constitutional sense until he was frisked, placed in handcuffs and detained in Resendes' cruise.  "[N]ot all encounters between law enforcement officers and citizens constitute seizures." United States v. Smith, 423 F.3d 25, 28 (1st Cir. 2005). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."  United States v. Drayton, 536 U.S. 194, 200–01 (2002).  As such, the few questions posed to the defendant prior to the seizure are properly considered in the probable cause and reasonable suspicion calculus.

_____

[9] The defendant does not challenge the reliability of any information source.  Cf. D.Mot. In this case, the corroborated statements by an accomplice certainly can support a probable cause finding.  See United States v. Raspberry, 882 F.3d 241, 245 (1st Cir. 2018).  Even, "the uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause." Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 10 (1st Cir. 2004).

Police officers may "approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment." United States v. Young, 105 F.3d 1, 6 (1st Cir.1997). Thus, "in order to find a seizure[, this Court] must be able to conclude that coercion, not voluntary compliance, most accurately describes the encounter." Smith, 423 F.3d at 28. "Under the objective totality of the circumstances standard, [this Court] look[s] not to 'whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" United States v. Ford, 538 F.3d 1, 5 (1st Cir. 2008), quoting California v. Hodari D., 499 U.S. 621, 628 (1991)

For instance, in the absence of physical restraint, an individual may feel unfree to leave in the face of "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Mendenhall, 446 U.S. 544, 554–55 (1980). "To constitute seizure, this Circuit requires one's liberty be restrained by either physical force or an assertion of authority." Ford, 538 F.3d at 4.

Here, none of those circumstances were present. Resendes was alone,[10] did not draw his weapon, did not touch the defendant, and did not use any tone indicating compulsion. See Ex. 4. Indeed, Resendes made his first inquiry – whether Rosser-Stewart lived at the residence -- from a distance, while in his cruiser. See Ex. 4. "Certainly the absence of any verbal command cuts against a finding of an objectively communicated exercise of authority." United States v. Tanguay, 918 F.3d 1, 6-8 (1st Cir. 2019) (collecting cases).

---

[10] See United States v. Hughes, 640 F.3d 428, 436 (1st Cir. 2011) (finding no custody where four officers responded to scene but "only" two questioned the defendant).

Even after exiting the cruiser and approaching Rosser-Stewart, the interaction was conversational, and not accusatory.  Resendes posed reasonable, conversational questions, given the circumstances -- do you live at the house, what are you doing.  See Ex. 4.  A reasonable person would not perceive them to be an order or command.  See United States v. Cardoza, 129 F.3d 6, 15 (1st Cir. 1997) (no seizure where police officers drove the wrong way on a one-way street to ask the defendant pointed questions including "Why are you out at this time of night?"); Ford, 548 F.3d at 6 (no seizure where police officer asked questions like, Can I speak to you for a minute?, where do you live?, where are you headed?); Smith, 423 F.3d at 30 (police officers did not seize defendant when they stood on either side of the telephone pole in front of defendant and requested his identification and did not draw their weapon, touch the defendant, or command that he stay, even though they addressed the defendant in a sarcastic tone).[11]

To be sure, the defendant visibly matched the five-point description of an armed robbery and shooting suspect,[12] and was trespassing upon private property at night.  See below, pp. 11-14. Yet, despite this obvious correlation, Trooper Resendes took an eminently measured and restrained approach, despite the extreme danger to the police and public that existed at the time. As such, the totality of the circumstances demonstrate that the defendant was not seized until he was frisked, placed in handcuffs, and detained in Trooper Resendes' cruiser.  Accordingly, the

---

[11] See, e.g, United States v. Fields, 823 F.3d 20 (1st Cir. 2016) (officers did not seize the suspect when they asked general questions in a conversational tone and did not physically touch suspect, brandish their weapons, or move toward suspect prior to seeing that the suspect possessed a knife, and the suspect was not meaningfully restricted in his field of movement).

[12] The five specific identifying facts known to police at the time were: black, male, wearing a hoodie, with braids, with a height of five foot eight to six feet.  See Exs. 1, 3, 6 (19.13.30) (black, male, hoodie), (19.57.37) (male, medium build, dark complexion, height and hairstyle description).

answers provided by Rosser-Stewart to Resendes' questions before being placed in handcuffs were prior to any seizure, and are properly considered in the suspicion calculus.

### C. Based upon the Detailed Description, and Circumstances, There Was Probable Cause to Believe that Rosser-Stewart Committed the Robbery and Shooting Once Trooper Resendes Approached Him

Based upon the information known to police at the time of the seizure, there was a sufficient basis to arrest the defendant for the robbery and shooting. Given the original information provided by G.D., the additional information provided by Officer Robinson, and the cooperating suspect, and the circumstances by which Resendes happened upon the defendant, and the defendant's implausible answers to the questions, there was probable cause to arrest him.

"[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232, (1983). For an arrest, "[p]robable cause exists if, at the time of the arrest, the collective knowledge of the officers involved was 'sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense.'" United States v. Ackies, 918 F.3d 190, 204 (1st Cir. 2019), citing United States v. Link, 238 F.3d 106, 109 (1st Cir. 2001). This is a "commonsense, nontechnical conception[ ] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act." Ornelas v. United States, 517 U.S. 690, 695 (1996) (quotes omitted). Indeed, probable cause only means "a fair probability," United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014) (quotation marks omitted), not absolute certainty that a defendant has committed a crime. See Gates, 462 U.S. at 243 n.13 ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.").

As an initial matter, the correlation between the defendant and the five-point description was arguably sufficient on its own to arrest him for the robbery and shooting. See United States v. Rachal, Crim. No. 16-10043, 216 F.Supp.3d 247, 250-51 (D.Mass. 2016) (O'Toole, J.) (probable cause to arrest given contact with defendant minutes after arrest, even though defendant did not precisely match the description).[13]  Beyond that, the other developing circumstances strengthened the probable cause determination.

The defendant was on foot, walking alone in a residential neighborhood, "sweating profusely" though it was below freezing, and was less than one-quarter of a mile from the getaway vehicle, which had been abandoned thirty minutes beforehand, near the location of the other arrests. See United States v. Burhoe, 409 F.3d 5, 10 (1st Cir. 2005) (probable cause to arrest robbery suspect, where defendant was stopped and he matched racial description, the abandoned getaway car was nearby, the suspects were known to be on foot, the defendant stood out in the neighborhood, and behaved strangely, among other factors).  The defendant's statements and implausible story about how he came to be present in Brockton ended all doubt. See United States v. Raspberry, 882 F.3d 241, 251 (1st Cir. 2018) ("A suspect's blatant prevarication in response to an officer's queries can support an inference of probable cause."); United States v. Brown, 457 F.2d 731, 733 (1st Cir. 1972) (finding defendant's nervousness and "contradictory statements" relevant in concluding that officers had probable cause to arrest). In

---

[13]  See United States v. Perry, 908 F.3d 1126, 1129 (8th Cir. 2018) (holding that description of a suspect was close enough to defendant's appearance that, when combined with other evidence such as when the defendant was found, "a reasonable officer could have concluded that [defendant] was the" perpetrator); see also United States v. Jones, 535 F.3d 886, 890 (8th Cir. 2008) (holding that probable cause to arrest defendant was present where defendant fit general description of suspect's height, race, clothing, and physical build, and the defendant was found less than a mile from the scene of the crime only thirty minutes after the crime was completed).

this context, a "reasonably prudent person would believe [Rosser-Stewart] had committed," the

armed robbery, and there was probable cause to arrest, even prior to his detention and

identification by the cooperating suspect.  Young, 105 F.3d at 6.

> **D.    The Information Known to the Police Was More than Sufficient to Justify
> the Stop of the Defendant In Order to Determine Whether He Was Involved
> in the Robbery and Shooting**

Even if this Court were to conclude that Resendes lacked probable cause to arrest the

defendant before the frisk, this Court can confidently deny the motion to suppress because the

same factual basis provided reasonable suspicion to detain the defendant until his involvement

was confirmed by the cooperating suspect. Significantly, the "Fourth Amendment does not

require a policeman who lacks the precise level of information necessary for probable cause to

arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.... A brief

stop of a suspicious individual, in order to determine his identity or to maintain the status quo

momentarily while obtaining more information, may be most reasonable in light of the facts

known to the officer at the time." Adams v. Williams, 407 U.S. 143, 145-146 (1972). "Based

upon [the] whole picture the detaining officers must have a particularized and objective basis for

suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S.

411, 417-418 (1981).  That being said, a combination of suggestive circumstances, largely

innocent in and of themselves, when considered in their totality, may constitute the "reasonable

suspicion" necessary to justify a Terry stop.  See United States v. Sokolow, 490 U.S. 1, 9 (1989).

To establish reasonable suspicion, there must be "specific and articulable facts which,

taken together with rational inferences from those facts, justify an intrusion on a private person."

United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012) (internal quotation marks omitted).

This is a "level of suspicion [that] ... is 'considerably less than proof of wrongdoing by a

preponderance of the evidence,' and 'obviously less' than is necessary for probable cause."

Navarette v. California, 572 U.S. 393, 397 (2014).

"A Terry stop is not necessarily a snapshot of events frozen in time and place," and "can entail an ongoing process.  For that reason, '[t]he propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold.'" United States v. Ruidiaz, 529 F.3d 25, 29 (1st Cir. 2008), quoting United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004).  "This means that if an officer undertakes an investigation pursuant to a Terry stop, his ensuing actions must be "fairly responsive to the emerging tableau." Id.

Furthermore, it is not a "divide-and-conquer analysis," which scrutinizes each factor in isolation. United States v. Arvizu, 534 U.S. 266, 274 (2002).  Rather, "the critical inquiry is whether reasonable suspicion arose under the totality of the circumstances." United States v. Andrade, 551 F.3d 103, 110 (1st Cir. 2008). This "requires a practical, commonsense determination" that "entails a measurable degree of deference to the perceptions of experienced law enforcement officers." Ruidiaz, 529 F.3d at 29.  In this case, there was ample basis to stop the defendant immediately at the moment Trooper Resendes observed him, let alone after the defendant's responses to the questions posed prior to the seizure.

To start, the defendant was the only person walking that night and matched the five-featured description of the suspect provided by the victim and an accomplice: black, male, wearing a hoodie, standing between five-feet eight-inches and six feet,[14] and wearing his hair in braids.  See Exs. 3, 4.  On its own, this direct correlation of the description far exceeded reasonable suspicion to detain the defendant.  See United States v. Pontoo, 666 F.3d 20, 28–29

---

[14] The arrest report lists the defendant's height as 5 feet, 11 inches tall, and the booking photo documents his hair being in braids. See Ex. 4.

(1st Cir.2011) (concluding that reasonable suspicion existed to detain the only person walking at 3:30 a.m. in the vicinity of a reported murder where that person fit the general description of the suspect); United States v. Lee, 317 F.3d 26, 31 (1st Cir. 2003) ("The two men were not only in the right place at the right time, but also fit the suspects' descriptions."); United States v. Tilmon, 19 F.3d 1221, 1225 (7th Cir.1994) ("exact match" of subject and his car to those described as involved in bank robbery two hours earlier; and collecting cases).

Beyond the description, the circumstances provided even further basis to detain.  The defendant was (1) on foot, as expected, (2) walking alone in a residential neighborhood at night, (3) wearing a hoodie, (4) sweating profusely on a below-freezing that night, (5) less than one-quarter of a mile from the getaway vehicle, (6) along the same road where the vehicle was abandoned (7) about thirtyminutes beforehand.  See United States v. Arthur, 764 F.3d 92, 96-99 (1st Cir. 2014) (reasonable suspicion based on number of suspects, race, gender, clothing, and approximate location and direction, and minutes elapsed since the robbery).[15]

As if that were not enough, the further information obtained from Rosser-Stewart in response to Resendes' questions only furthered the now-overwhelming picture: (1) he was knocking on a door to a home he did not reside at, (2) he lived over thirty miles away, and (3) was trying to get back home by knocking on a random residence; a more-than suspicious explanation[16] for his presence in the area.  When the answers are considered with the

---

[15] See also United States v. Abdus–Price, 518 F.3d 926, 930 (D.C.Cir.2008) (citing the fact a stop was conducted less than 40 minutes after a robbery as a factor supporting reasonable suspicion).

[16] See United States v. Brown, 457 F.2d 731, 733 (1st Cir. 1972) (finding defendant's nervousness and "contradictory statements" relevant in concluding that officers had probable cause to arrest); United States v. Raspberry, 882 F.3d 241, 251 (1st Cir. 2018) ("A suspect's blatant prevarication in response to an officer's queries can support an inference of probable cause.").

15

circumstances and description, see United States v. Roberts, 787 F.3d 1204, 1207 (8th Cir. 2015)

( "close temporal and physical proximity of the car to the crime"), there was more than

reasonable suspicion to briefly detain the defendant in order to determine whether or not the

defendant was one of the robbers.  Indeed, "[i]n light of the attendant circumstances, a failure to

stop the [defendant] and question [him] briefly would have verged on a dereliction of duty."

Arthur, 764 F.3d at 98.

### 1.   The Scope and Length of the Detention Were Reasonable

Even if there was not probable cause to immediately arrest, the scope and length of the

purpose of the detention comported with the law governing investigatory stops.  Once there is

reasonable suspicion to stop, "any action undertaken pursuant to that stop must be reasonably

related in scope to the stop itself unless the police have a basis for expanding their

investigation."  Andrade, 551 F.3d at 109.  Here, the pat-frisk and use of handcuffs were proper

because Resendes was interacting with a person potentially involved in a recent violent crime,

where the police were fired upon.  Furthermore, the length of the stop was no longer than

necessary to determine whether the defendant was involved in the robbery and shooting.

### a.   The Pat-Frisk and Use of Handcuffs were Reasonable and Did Not Convert the Stop to an Arrest

"When an officer is justified in believing that the individual whose suspicious behavior

he is investigating at close range is armed and presently dangerous to the officer or to others,' he

may conduct a limited protective search for concealed weapons." Adams, 407 U.S. at 146.[17]

Additionally, while it is true that "the use of handcuffs, being one of the most recognizable

---

[17] See United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004) ("[I]n determining whether a pat-down search is an appropriate step following a valid Terry stop, the key is whether, under the circumstances, 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'").

indicia of a traditional arrest, 'substantially aggravates the intrusiveness' of a putative Terry

stop," it is also clear that officers may handcuff a suspect when "the use of such restraints [is]

necessary to carry out the legitimate purposes of the stop without exposing law enforcement

officers, the public, or the suspect himself to an undue risk of harm." Acosta-Colon, 157 F.3d 9,

19 (1st Cir. 1998); Pontoo, 666 F.3d at 28–29 ("When officer safety is a legitimate concern, a

Terry stop appropriately may involve the application of handcuffs.").

     In this case, the frisk and brief detention of the defendant until he could be identified by

the cooperating suspect were certainly justified by the nature of the crime and threat to public

safety presented by the robbery, high-speed chase, and shots being fired at police.[18]  This was

more than sufficient to justify a pat-frisk, and use of handcuffs, without converting the stop into

an arrest.  Resendes also informed the defendant that his detention was temporary until he could

determine whether he was involved in the robbery.  See Berkemer v. McCarty, 468 U.S. 420,

441–42 (1984) (holding that defendant was not subjected to "the functional equivalent of formal

arrest" where "[a]t no point during the [period between his initial stop and his arrest] was [he]

informed that his detention would not be temporary" and the detaining officer "never

communicated his intention" to take defendant into custody); Pontoo, 666 F.3d at 30 (noting that

"information conveyed to the detainee" is relevant in assessing de facto arrest).

**b.  The Length of the Detention was No Longer than Necessary**

     As for the length of the stop, the at-most ten minutes required for the cooperating suspect

to identify the defendant through a photograph was certainly reasonable.  While courts consider

---

[18] See United States v. Rabbia, 699 F.3d 85, 92 (1st Cir. 2012) (holding no de facto arrest
despite the use of handcuffs by officer who was "effectively alone in confronting [the
defendant]"); United States v. Fornia-Castillo, 408 F.3d 52, 65 (1st Cir. 20005) (holding no de
facto arrest where stop occurred on busy public street and lone officer handcuffed the defendant
for fifteen minutes).

the duration of a *Terry* stop in assessing its constitutionality, there is "no rigid time limitation on Terry stops." <u>United States v. Sharpe</u>, 470 U.S. 675, 685 (1985). Instead, courts look to "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." <u>Id.</u> at 686–87. When courts engage in this inquiry, they also take into account "whether the police are acting in a swiftly developing situation, and in such cases the court[s] should not indulge in unrealistic second-guessing." <u>Id.</u>

Here, the stop was limited in scope and duration despite the serious crimes that preceded it.  "Under these circumstances, there was good reason for Sullivan to fear that [the defendant] was armed and dangerous, and to neutralize the risk of harm by drawing his weapon, applying handcuffs, and conducting a pat-frisk." <u>United States v. Rabbia</u>, 699 F.3d 85, 93 (1st Cir. 2012). Once detained, Resendes also promptly obtained information concerning the defendant's criminal history, revealing his prior involvement in robberies and firearms, tipping the already-laden scale of probable cause.  <u>See</u> <u>United States v. Tanguay</u>, 918 F.3d 1, 4-5 (1st Cir. 2019) (running records check was reasonable during Terry stop). The Brockton Police acted diligently in responding to the detained suspect, and confirming his involvement through a photograph transmitted to the cooperating suspect, who then positively identified the defendant.

This took place within ten minutes, <u>see</u> Ex. 6 (20.06.25), (20.10.36), and was a model of diligent effort to confirm or dispel the already significant evidence that had accrued against the defendant. If that manner of identification were not available, a longer period of detention to certainly would have been justified to pursue other investigative measures.[19]

---

[19] For example, the police would have been reasonable in travelling to the store to review the surveillance video, or conducting a show-up identification. <u>Compare</u> <u>United States v. Rabbia</u>, 699 F.3d 85, 93 (1st Cir. 2012) (collecting cases), <u>United States v. Owens</u>, 167 F.3d 739, 749

<u>CONCLUSION</u>

For the reasons discussed above, the government respectfully requests that the Court

deny defendant's motion to suppress.

Respectfully submitted,

ANDREW LELLING
United States Attorney

By:     <u>/s/ Philip Mallard</u>
        PHILIP MALLARD
        Assistant U.S. Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ Philip Mallard</u>
PHILIP MALLARD
Assistant U.S. Attorney

Date:   October 28, 2019

<u>List of Exhibits</u>
Exhibit 1:      Transcripts of Pertinent Portions of Brockton Turret Tape
                a.   01-26-19 19.13.30 5082110841 (508) 211-0841.wav
                b.   01-26-19 19.47.56 Radio (RADIO 1).wav
                c.   01-26-19 19.49.28 Radio (RADIO 1).wav
                d.   01-26-19 19.57.37 Radio (RADIO 1).wav
Exhibit 2:      Still Images from T-Mobile Store Surveillance
Exhibit 3:      Pertinent Brockton Police Reports,
Exhibit 4:      Massachusetts State Police Report
Exhibit 5:      Map of Pertinent Locations
Exhibit 6:      Compact Disc of Brockton Turret Tape (filed at clerk's office, 10/29/19)
Exhibit 7:      Still Images of Booking Video of Rosser-Stewart

---

(1st Cir. 1999) (finding fifty-minute detention not unconstitutional under the circumstances)
<u>United States v. McCarthy</u>, 77 F.3d 522, 531 (1st Cir. 1996) (a seventy-five minute detention not
unconstitutional because the officers attempted to confirm whether defendant was involved in an
armed bank robbery by researching the vehicle registration and conducting show-up
identification).