UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| v. | * | Criminal Action No. 19-cr-10104-ADB-3 |
| STEPHAN ROSSER-STEWART, | * | |
| Defendant. | * | |

# MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS

BURROUGHS, D.J.

On September 11, 2019, a grand jury returned an indictment charging Stephan Rosser-Stewart ("Rosser-Stewart") with: conspiracy to Interfere with Commerce by Robbery in violation of 18 U.S.C. § 1951(a) (Count I); interfering with Commerce by Robbery in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2 (Count II); discharging, Brandishing, Using and Carrying a Firearm in Relation to a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 2 (Count IX), and being a Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(1) (Count X). [ECF No. 55]. Currently pending before the Court is Rosser-Stewart's motion to suppress evidence obtained by police when he was stopped on January 26, 2019. [ECF No. 75]. For the reasons set forth below, the motion to suppress, [ECF No. 75], is <u>DENIED</u>.

## I. BACKGROUND

The following facts are drawn from the arrest report, [ECF No. 91-4 ("Arrest Report")], prepared by Massachusetts State Police Trooper Eric Resendes ("Resendes"), pertinent Brockton

Police reports, [ECF No. 91-3 ("Brockton Reports")], and transcripts of relevant portions of Brockton Police radio communications, [ECF No. 91-1 ("Turret Tape")].

On the evening of January 26, 2019, Resendes was on patrol in the city of Brockton in a marked police cruiser. [Arrest Report at 2]. At approximately 7:15 p.m., Resendes received radio transmissions indicating that officers from the Brockton Police Department were pursuing a vehicle occupied by four black males wearing hooded sweatshirts, who were believed to have robbed a T-Mobile store at gunpoint. [Id.]. Officer Robinson of the Brockton Police communicated that the suspects had shot at officers while fleeing. [Brockton Reports at 2, 10]. The vehicle was subsequently abandoned following a crash at the intersection of Bristol Avenue and Carl Avenue. [Arrest Report at 2]. Upon proceeding to the area to assist with a search for the suspects, Resendes learned that Brockton Police had apprehended two of the four suspects, but had not recovered any of the suspects' weapons. [Arrest Report at 2; Turret Tape at 7]. One of the remaining suspects was described as being about 5'8" to 6' tall and having long braided hair, with a medium build and dark complexion. [Turret Tape at 8].

At approximately 8:03 p.m., Resendes observed a black male with braided hair, wearing a hooded sweatshirt, standing 5'11" in height, with a medium build and dark complexion cross the street and walk up the steps to a residence at 149 Carl Avenue, approximately a quarter mile away from where the suspects' vehicle was abandoned. [Arrest Report at 1–2]. The man was "sweating profusely," despite not wearing a jacket on a late-January night, and was "walking around on Carl Ave. knocking on doors." [Brockton Reports at 3]. Resendes stopped his cruiser in front of the residence, rolled down the window, and asked the male, later identified as Rosser-Stewart, if he lived at the house. [Arrest Report at 2]. Rosser-Stewart said that he did not. [Id.]. Resendes stepped out of his cruiser and asked Rosser-Stewart what he was doing. [Id.]. Rosser-

2

Stewart said that he had gotten into a fight with his girlfriend, who had made him get out of her car, and that he was trying to get home. [Id.]. Resendes then asked Rosser-Stewart if he lived in Brockton. [Id.]. Rosser-Stewart said that he lived in Boston. [Id.].

Resendes instructed Rosser-Stewart to raise his hands and not to move. [Id.]. He then approached Rosser-Stewart, placed him in handcuffs, and performed a pat-frisk for weapons. [Id.]. Resendes placed Rosser-Stewart "in the rear seat of [his] cruiser . . . and informed him that he was not under arrest, however he would be detained until [Resendes] could rule out that he was not a suspect of a recent crime." [Id.]. Resendes radioed State Police dispatch and learned that Rosser-Stewart's criminal history included armed robbery and illegal possession of a firearm. [Id.].

Two officers from the Brockton Police Department then arrived on the scene to assist Resendes. [Id. at 3]. One officer sent a photo of Rosser-Stewart to a Brockton detective, who was interviewing a cooperating suspect. [Brockton Reports at 12]. After the cooperating suspect confirmed that Rosser-Stewart was one of the suspects involved in the armed robbery, officers from the Brockton Police placed Rosser-Stewart under arrest and took him into custody. [Id. at 3, 12; Arrest Report at 3].

## II. DISCUSSION

The Fourth Amendment of the Constitution protects citizens against unreasonable searches and seizures. U.S. Const. amend. IV. Law enforcement officers "may stop and briefly detain an individual for investigative purposes if [they] have a reasonable suspicion that criminal activity is afoot." United States v. Dapolito, 713 F.3d 141, 147 (1st Cir. 2013) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989), Terry v. Ohio, 392 U.S. 1, 30 (1968)). "An evaluation of the constitutionality of an investigatory stop involves two steps: (1) whether the initial stop

3

was justified and (2) 'whether it was reasonably related in scope to the circumstances which justified the inference in the first place.'" United States v. Mohamed, 630 F.3d 1, 6–7 (1st Cir. 2010) (quoting Schubert v. City of Springfield, 589 F.3d 496, 501 (1st Cir. 2009)).

### A. The Stop Was Justified at Its Inception

Resendes' investigatory stop was justified at its inception. Rosser-Stewart argues that Resendes "lacked reasonable articulable suspicion to detain" him. [ECF No. 75 at 1]. To establish reasonable suspicion, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002). Officers "must be able to point to specific and articulable facts which, taken together," justify an investigatory stop. Terry, 392 U.S. at 21. The Court considers the facts "available to the officer at the moment of the seizure," taking into account the totality of the circumstances. Terry, 392 U.S. at 22; see United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987).

Here, under the totality of the circumstances, Resendes had reasonable suspicion to stop and detain Rosser-Stewart. At the time of their encounter, Resendes was searching for a black male with long braided hair, about 5'8" to 6' tall, with a medium build and dark complexion, wearing a hooded sweatshirt. [Arrest Report at 2; Turret Tape at 8]. Resendes encountered Rosser-Stewart on Carl Avenue, approximately a quarter mile away from where the suspects' vehicle had been abandoned roughly thirty minutes prior. [Arrest Report at 2; ECF 91-5]. See United States v. Arthur, 764 F.3d 92, 97 (1st Cir. 2014) (finding that an investigatory stop "[j]ust minutes" after a robbery was justified "when the suspects, who mostly matched the description, were encountered just an eighth of a mile from the crime scene"); see also United States v. Cabreras-Cañuelas, No. 15-cr-00665, 2016 WL 7985788, at *4 (D.P.R. Oct. 3, 2016) ("A

4

reasonable officer could certainly factor [the defendant's] temporal and geographic proximity to the scene of a serious, violent crime when calculating whether he was a suspicious person."). Resendes recognized that he satisfied the description of the suspect in the recent robbery. [Arrest Report at 2; ECF 91-5]. See Arthur, 764 F.3d at 97–98 (finding that officers had probable cause based upon "description of the number of suspects and their race, gender, clothing, and approximate location"). This was sufficient to warrant the initial stop.

### B. The Stop Was Reasonable in Scope

The stop was also reasonable in scope and did not amount to a *de facto* arrest. "There is no scientifically precise formula that enables courts to distinguish between valid investigatory stops . . . [and] '*de facto* arrests.'" United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994). Relevant factors include "the location and duration of the stop, the number of police officers present at the scene, the degree of physical restraint placed upon the suspect and the information conveyed to the suspect." United States v. Rabbia, 699 F.3d 85, 91 (1st Cir. 2012).

First, the detention lasted, at most, six minutes prior to the arrival of the Brockton Police officers who quickly confirmed that Rosser-Stewart had been identified as a participant in the robbery. [Arrest Report; Brockton Reports at 8]. See Mohamed, 630 F.3d at 6–7 ("Officers are permitted, under the Fourth Amendment, to stop an individual, briefly, based on a reasonable suspicion that the individual may be involved in criminal activity."); see also Rabbia, 699 F.3d at 93 (finding that a detention of roughly thirty minutes was not a *de facto* arrest); United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999) (finding that a detention of fifty minutes was not a *de facto* arrest); United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998) (finding that a detention of "at least" thirty minutes was not a *de facto* arrest); United States v. McCarthy, 77 F.3d 522, 531

(1st Cir. 1996) (finding that a seventy-five-minute detention in a police car was not a *de facto* arrest).

The length of the stop was justified because "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686 (1985); see, e.g., United States v. Mouscardy, 722 F.3d 68, 74 (1st Cir. 2013) ("In addition to the overall brevity of the stop, there is no evidence that it was unreasonably prolonged."); Owens, 167 F.3d at 749 (finding that a fifty-minute stop was justified because officers had to verify whether defendant had a driver's license and perform a number of computer checks). Here, officers were investigating an armed robbery, after which shots were fired at police, and two possibly armed suspects were still at large. Because they pursued this investigation diligently and without delay, the length of the stop was not unreasonable.

Second, Resendes' decision to put the suspect in handcuffs and have him sit in the patrol car was warranted by the circumstances and did not transform the stop into an arrest. Because Resendes was patrolling alone when he encountered Rosser-Stewart, it was permissible for him to take additional steps to ensure his own safety during the investigatory stop, particularly where he knew that the suspects had fired their weapons at police. [Brockton Reports at 2, 8, 10; Arrest Report at 2; Turret Tape at 7]. See Rabbia, 699 F.3d at 92 (finding that an officer had "good reason . . . to neutralize the risk of harm by . . . applying handcuffs, and conducting a pat-frisk" when confronting a suspect "effectively alone"); see also United States v. Fornia–Castillo, 408 F.3d 52, 65 (1st Cir. 2005) (holding that a stop did not ripen into an arrest in part because detaining officer initially "was the only officer on the scene" (internal quotation marks omitted)); United States v. Acosta–Colon, 157 F.3d 9, 18 (1st Cir. 1998) ("Police officers

6

engaged in an otherwise lawful stop must be permitted to take measures . . . they believe reasonably necessary to protect themselves from harm . . . ."). During an investigatory stop, officers may conduct a limited pat-frisk of a person's outer clothing for weapons for the officers' safety and the safety of others. Terry, 392 U.S. at 30. This was warranted here, given that there had been shots fired and the weapons had not yet been recovered.

Additionally, "[a]lthough handcuffs are traditionally associated with an arrest, the use of handcuffs during an investigatory stop does not convert the stop into an arrest as long as the officers involved reasonably believed handcuffs were necessary to protect themselves or others under the circumstances that existed." Mohamed, 630 F.3d at 6; see also Fornia-Castillo, 408 F.3d at 64 ("[N]either the use of handcuffs nor the drawing of a weapon necessarily transforms a valid Terry stop into a *de facto* arrest."). "When officer safety is a legitimate concern, a Terry stop appropriately may involve the application of handcuffs." United States v. Pontoo, 666 F.3d 20, 30 (1st Cir. 2011).

Here, Resendes had reason to suspect that Rosser-Stewart was armed and dangerous. Based on the environment and his observations, Resendes was justified in placing Rosser-Stewart in handcuffs, conducting a pat-frisk to ensure his safety and the safety of others, and placing Rosser-Stewart in the rear of his cruiser while he conducted a brief investigation. Such actions, viewed in context, did not convert the investigatory stop into a *de facto* arrest.

Finally, Rosser-Stewart was explicitly told that he was not under arrest. See Rabbia, 699 F.3d at 93 (noting that courts may consider "information conveyed to the detainee" and finding that an investigatory stop was not an arrest when "officers explicitly informed [the defendant] that he was not under arrest, that he was being handcuffed as a safety measure and that the handcuffs would be removed when other police officers arrived"). Resendes informed Rosser-

7

Stewart "that he was not under arrest, however he would be detained until [Resendes] could rule out that he was not a suspect of a recent crime." [Arrest Report at 2]. Given the circumstances confronting the officer at the time of the stop, "'[t]he stop at issue here, while intrusive, was both proportional to the occasion and brief in duration.'" Rabbia, 699 F.3d at 93 (quoting Pontoo, 666 F.3d at 31).

## III. CONCLUSION

Accordingly, Rosser-Stewart's motion to suppress, [ECF No. 75], is DENIED.

**SO ORDERED.**

December 17, 2019                                             /s/ Allison D. Burroughs
                                                              ALLISON D. BURROUGHS
                                                              U.S. DISTRICT JUDGE