# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STEPHAN ROSSER-STEWART,<br><br>Defendant | No. 19-CR-10104-ADB |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF MOTION FOR DETENTION[1]

The government hereby files this memorandum in support of its motion to detain the Defendant, Stephan Rosser-Stewart ("Rosser-Stewart" or the "Defendant"). This defendant robbed a store at gunpoint, and then fired his weapon at police officers during the high-speed chase that ensued. The defendant's trial is less than sixty days away.

Put plainly, the defendant presents a tremendous danger to the community, and witnesses, a pronounced risk of flight given the facts of this case and his past defaults and unwillingness to come to court, and he has historically threatened and intimidated witnesses against him. As the facts of this case and the defendant's criminal history demonstrates, no conditions of release can assure the safety of the community or particular witnesses in this case, or prevent him from committing additional crimes. The defendant must be detained.[2]

---

[1] The government makes reference to the Exhibits filed previously in opposition to the codefendant's Motion to Revoke Detention Order. See ECF #83 (opposition), 83-1 (transcript of codefendant's detention hearing), ECF #86-1 through 86-19 (exhibits admitted at detention hearing). References to exhibits submitted in support of this opposition are by exhibit number and page, where appropriate, e.g., Ex. _, p. _. The government assumes the Court has access to the defendant's criminal history through the pretrial services report.

[2] The defendant's motion makes no reference to a claim for release related to susceptibility of COVID-19. Cf. ECF #221. Moreover, the defendant did not report any illnesses or ailments at the time of the defendant's admission to the Plymouth County Correctional Facility (PCCF) that would make him at greater risk of complications related to COVID-19. The

## BACKGROUND

**I.  PROCEDURAL HISTORY**

On March 27, 2019, a Grand Jury sitting in the District of Massachusetts indicted the defendant and two codefendants.  The defendant was arraigned on April 5, 2019, and the government moved for detention, on the grounds of dangerousness, risk of flight and serious risk of obstruction of justice. [ECF #12].

On September 11, 2019, a Grand Jury returned a Superseding Indictment, charging the defendant with the following offenses:

- Count One, Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a);

- Count Two, Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a);

- Count Nine, Discharging, Brandishing, Using and Carrying a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c); and

- Count Ten, Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1).

ECF #55.

On September 30, 2019, the defendant filed a motion to suppress [ECF #75], which the government opposed [ECF #91].  The District Court denied the defendant's motion to suppress without a hearing, in a written decision [ECF #97].

On October 3, 2019, the defendant's case was set for trial to commence on June 1, 2020. [ECF #77].

---

government produced the defendant's medical intake at PCCF as part of discovery in this case. The defendant did not claim to suffer from asthma, diabetes, or any other condition that would place him at higher risk related to COVID-19.

On February 6, 2020, defendant filed a motion to suppress identification [ECF #116], for which the government sought and received an extension until April 10, 2020, to oppose. [ECF #147, 148]. The government's response has not yet been filed.

On March 2, 2020, the codefendant, Diovanni Carter, proceeded to a separate trial. After a two-week trial, a jury convicted Diovanni Carter of Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a), Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a), and Discharging, Brandishing, Using and Carrying a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c). [ECF #211]. Sentencing is scheduled for July 7, 2020. [ECF #212].

On April 1, 2020, the defendant filed the instant motion for a detention hearing. [ECF #221]. The defendant submitted no documentation in support of his motion.

## II.    GROUNDS FOR DETENTION

The government seeks detention of Defendant Rosser-Stewart on the following grounds:

- 18 U.S.C. § 3142(f)(1)(A), because Interference with Commerce by Robbery is a crime of violence;[3]

- 18 U.S.C. § 3142(f)(1)(B), because Discharging, Brandishing, Using and Carrying a Firearm in Relation to a Crime of Violence, carries a maximum penalty of life imprisonment;[4]

---

[3] Interference with Commerce by Robbery (Hobbs Act robbery) is categorically a crime of violence under the force clause because it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." See United States v. Garcia-Ortiz, 904 F.3d 102, 109 (1st Cir. 2018) ("we therefore hold that because the offense of Hobbs Act robbery has as an element the use or threatened use of physical force capable of causing injury to a person or property, a conviction for Hobbs Act robbery categorically constitutes a 'crime of violence' under section 924(c)'s force clause"); 18 U.S.C. § 3156(a)(4) (same force clause definition of crime of violence as Section 924(c)).

[4] See United States v. Shiflett, 715 Fed.Appx. 258, 260 (4th Cir. 2017) ("Congress did not specify any maximum sentence for any particular § 924(c)(1)(A) offense; rather, it provided a series of

- 18 U.S.C. § 3142(f)(1)(D), because the defendant has been convicted of armed robbery, assault dangerous weapon, and animal cruelty, which are crimes of violence (armed robbery also carries a life imprisonment maximum);

- 18 U.S.C. § 3142(f)(1)(E), because the defendant is charged with felonies that involve the possession or use of a firearm;

- 18 U.S.C. § 3142(f)(2)(A), because the defendant's defaults in other cases demonstrates that he will not return to Court if released; and

- 18 U.S.C. § 3142(f)(2)(B), because the defendant's criminal history and past incident reports show that he has historically attempted to threaten and intimidate witnesses in other cases.

Additionally, in this particular case two presumptions arise under 18 U.S.C. § 3142(e)(2) & (3), supporting the government's position that the defendant must be detained pending trial.

First, the defendant has been convicted of a "state" "offense" of armed robbery, and assault by means of a dangerous weapon, "that would have been an offense described in subsection (f)(1) of this section," i.e., a crime of violence, "if a circumstance giving rise to Federal jurisdiction had existed." 18 U.S.C. § 3142(e)(2)(A). This armed robbery case took place on July 15, 2015,[5] while the defendant was "on release," 18 U.S.C. 3142(e)(2)(B), from a Lowell District Court forgery and uttering case. See Criminal History, Docket 1411CR003664. The defendant was convicted of the armed robbery on October 16, 2018, therefore "not more than five years has elapsed since the date of conviction." 18 U.S.C. § 3142(e)(2)(C). As such, "a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of any other person and the community."

---

mandatory minimum sentences for various gun offenses. The absence in a statute of a maximum penalty has been consistently interpreted to mean that the maximum authorized sentence is life imprisonment.").

[5] See Exhibit 8 (Docket 1507CR003153 Dorchester District Court Complaint), Exhibit 9 (1802CR002104, Suffolk Superior Court case).

Additionally, the defendant is charged with an offense under 18 U.S.C. § 924(c), and therefore, "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(B).

## III. FACTUAL BACKGROUND

On January 26, 2019, at about 7:11 p.m., three men armed with guns entered a T-Mobile store in Brockton (ECF #81-1, p. 8-15; ECF #86-2). The store surveillance captured the incident and descriptions of the robbers (ECF #81-1, p. 8-15). The first man, later identified to be Darius Carter,[6] was wearing a black sweatshirt with a white logo on the breast, black sweatpants with a white logo on the thigh, white gloves with black accents, and black and white Jordan sneakers (ECF #81-1, p. 8-15; ECF #86-2). The second man, later identified to be the Defendant, wore a black top, jeans, fuchsia underpants (visible when he bent over), off-grey sneakers and carried a black duffel bag (ECF #81-1, p. 8-15; ECF #86-2). The third man, later identified to be Dennis Martin, wore a navy blue sweatshirt, navy blue sweatpants and white sneakers (ECF #81-1, p. 8-15; ECF #86-2).

All three men also held firearms: Darius held a large frame silver firearm, later identified to be an Armi Fratelli 9mm; Rosser-Stewart held a small frame silver, later identified to be a Jennings .22 caliber; and Dennis Martin held a black Ruger .380 caliber firearm with a visibly extended magazine (ECF #81-1, p. 13). As they entered the store, Darius and the Defendant drew their firearms, pointed them at the employee, and directed him to the back, where the inventory was kept (ECF #81-1, p. 8-15; ECF #86-2). Martin entered last (ECF #81-1, p. 8-13).

---

[6] The government distinguishes the Carter brothers by first name.

While the robbery took place, Diovanni Carter remained in a rented white Chevrolet Malibu that the robbers used to get to Brockton (ECF #81-1, p. 15, 19, 62-63).

While entering the code, Darius Carter struck the employee in the head with his firearm (ECF #81-1, p. 13).  Once in the back room, the employee opened the large cabinet that contained the inventory of phones and tablets (ECF #81-1, p. 12-16).  Martin held the employee at gunpoint, while the Defendant emptied the cabinet into the duffel bag (ECF #81-1, p. 12-16).  Darius went to the front of the store and checked another room (ECF #81-1, p. 11-16).  Martin obtained a clear plastic trash bag from a bin and the men put additional phones, tablets and cash into that bag as well (ECF #81-1, p. 10-18).  As the Defendant bent over to place phones in the bag, his pink/purple underpants were visible on the surveillance video.  See Ex. 2 & Ex. 7.[7]

Within three minutes, the men left the store with Martin carrying the clear plastic bag and Rosser-Stewart carrying the duffel bag (ECF #81-1, p. 14-17).  In total, they stole approximately $20,000 worth of cellular telephones and tablets, and approximately $4,500 in currency (ECF #81-1, p. 10).  Among the stolen items was a covert tracking device that alerted a security company when it travelled beyond the area of the store, and provided real-time tracking information of its whereabouts to the security company (ECF #81-1, p. 16-19).

The three robbers got back into the white Malibu: Diovanni drove, Rosser-Stewart was in the front passenger seat, Martin sat in the rear behind the driver's seat, and Darius sat in the rear on the passenger side (ECF #81-1, p. 16-25).  The tracking device reported the location and speed of the device as it travelled through downtown Brockton onto Crescent Street, and turning onto Lyman Street, at which point it entered a residential neighborhood (ECF #81-1, p. 19-22;).

---

[7] The sneakers appear different at booking, because they had been unzipped, revealing the red tongue of the sneakers.

This information was reported to Brockton Police who identified the white Malibu as the getaway vehicle and attempted to stop the car (ECF #81-1, p. 19-24).  The vehicle would not stop and travelled into the residential neighborhood, speed over 50 MPH, making quick turns on short streets (ECF #81-1, p. 19-25).  Ultimately, the Malibu turned onto Summer Street, a long, relatively straight road (ECF #81-1, p. 19-23).

While on Summer Street the tracking device reported speeds well over 70 MPH (ECF #81-1, p. 19-22).   Darius Carter fired about five shots at the police, while Diovanni Carter urged him on.  Following this, the defendant fired one or two shots at the pursuing police officers.  The lead officer was only a few feet behind the Malibu, but was not hit (ECF #81-1, p. 21-28).  In fact, the Defendant shot Darius Carter in the shoulder. See Ex. 18, p. 56-57 (grand jury testimony discussing of shooting after arrest).

The City of Brockton ShotSpotter system, which is a series of microphones placed through the city that monitor and record sound frequencies consistent with gunfire, reported a total of eight gunshots being fired at 7:20 p.m. and located the source of the gunfire as Summer Street, consistent with the location of the tracking device at the time.  The lead officer pulled back, but continued to follow the Malibu as it turned onto Carl Avenue and came to a stop at the intersection of Carl Avenue and Bristol Avenue (ECF #81-1, p. 27-32; Ex. 15).[8]

The occupants fled down the area of Bristol Avenue and officers were in pursuit (ECF #81-1, p. 27-32; ECF #86-1, 4).   Darius was apprehended shortly after abandoning the vehicle, in a wooded area across Baker Street (ECF #81-1, p. 29-32; ECF #86-4).  Darius was wearing the exact same clothing as depicted in the store video, but was not wearing gloves (ECF #81-1, p.

---

[8] Brockton Police did not return fire (Tr. 28).

30-32; ECF #86-1, 10-11).[9]   Martin was arrested closer to the Malibu than Darius, at 44 Baker Street, hiding behind a fence (ECF #81-1, p. 29-30; ECF #86-4).  Rosser-Stewart was apprehended down the street in the area of 149 Carl Avenue (ECF #81-1, p. 35; ECF #86-4).  During the booking process, the Defendant pulled his pants up and bent over, revealing the same fuschia underpants that were captured on video.  See Exhibit 7.

Diovanni was not apprehended that night, and a warrant was sought for him subsequent to the robbery; he remained wanted on the warrant until March 5, 2019 (Tr. 38).

About five yards from where Darius Carter was apprehended, the silver Armi Fratelli 9mm firearm (the firearm held by Darius), and the black Ruger .380 firearm with the extended magazine (the firearm held by Martin) were found wedged underneath a rock (ECF #81-1, p. 32-34, ECF #86-12).  There was no ammunition in the Armi Fratelli and there were multiple rounds of .380 ammunition in the black Ruger (ECF #81-1, p. 32-37; ECF #86-12).  A 9mm casing was recovered from Summer Street, and tool-marking comparisons identified the Armi Fratelli firearm as having fired the recovered 9mm casing (ECF #86-14). A few days after the robbery, a Jennings .22 caliber firearm was recovered in the area of Litchfield Street, close to where the Malibu was abandoned (ECF #81-1, p. 33-37; ECF #86-4, 13).  This firearm was consistent with the firearm used by Rosser-Stewart, and matched the caliber of casing located in the front passenger seat (ECF #81-1, p. 34-36; ECF #86-4).

In the Malibu, investigators found mail addressed to Diovanni Carter, and a Hertz rental agreement identifying him as an authorized operator (ECF #81-1, p. 36-39; ECF #86-5, 7).  In the front passenger area, investigators located a spent .22 caliber shell casing, a black jacket

---

[9] In the rear passenger-side area of the Malibu, investigators found the white gloves with black accents that Darius wore during the robbery (ECF #81-1, p. 30-32, 35-36; ECF #86-6, 10).

consistent with that worn by Rosser-Stewart during the robbery, and the black duffel bag containing phone and tablets and currency (ECF #81-1, p. 36-39; ECF #86-5). In the rear of the vehicle, investigators located the clear plastic trash bag containing the phones and tablets (ECF #81-1, p. 36-39; ECF #86-5). An inventory comparison was conducted and it was determined that all of the stolen items and the covert tracking device were recovered in the vehicle (ECF #81-1, p. 37-39; ECF #86-9). Investigators also lifted a fingerprint of Diovanni Carter from the rear passenger side door (ECF #81-1, p. 56).

Records from Hertz for the white Malibu revealed that the car had been rented on January 16, 2019, in the name of Carshana Graham (ECF #81-1, p. 38-40; ECF #86-7, 86-8). Though rented in the name of Graham, Diovanni Carter was listed as an authorized driver of the Malibu, and a phone number ending in 2207 was listed as a contact number (ECF #81-1, p. 39-40; ECF #86-8).

Investigators also learned that after the Malibu was abandoned, Diovanni Carter had a series of calls to and from a phone associated with a person identified as J.B.[10] (ECF #81-1, p. 52; ECF #86-16, p. 8). The calls were noted at 7:37 p.m., 7:46 p.m., and 7:43 p.m., which was after the vehicle was abandoned (ECF #81-1, p. 52; ECF #86-16, p. 8). J.B. resided at 82 Carl Avenue, which was approximately 300 yards from where the Malibu was abandoned, and a few houses down from where Rosser-Stewart was apprehended (ECF #81-1, p. 46-53; ECF #86-4, 16).

## **LEGAL STANDARD**

---

[10] In accordance with the Local Rules, the government employs the initials for an unindicted coconspirator, and has redacted the name to the initials in the transcript. See LR 116.1(c)(1)(E) ("If subsequent litigation requires that the name of any such unindicted coconspirator be referenced in any filing directly with the court, that information must be redacted from any public filing and be filed under L.R. 7.2 pending further order of the court.").

A defendant must be detained pending trial if, after a hearing, the court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(e).[11]  The government bears the burden of demonstrating that the defendant poses a danger to the community by clear and convincing evidence, or that the defendant poses a flight risk by a preponderance of the evidence.  See United States v. Rose, 2012 WL 2500497, *1 (D. Mass. 2012) (Gorton, J.).

In determining whether any conditions of release will reasonably assure the defendant's appearance and the safety of any other person and the community, the Court must consider the factors set forth in 18 U.S.C. § 3142(g), which include: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger that the defendant's release would pose to any other person or the community.

Where, as here, the defendant is charged with an offenses described under Section 3142(e)(2) and 3142(e)(3), rebuttable presumptions arises of both danger to the community and risk of flight.  See 18 U.S.C. § 3142(e)(2) & (3).  While the defendant bears the burden of producing evidence to rebut that presumption, the ultimate burden of proof remains with the Government.  See United States v. Gennaco, 834 F. Supp.2d 38, 40 (D. Mass. 2011) (Gorton, J.).

---

[11] As noted by the Senate Judiciary Committee: "This reference to safety of any other person is intended to cover the situation in which the *safety of a particular identifiable individual, perhaps a victim or witness*, is of concern, while the language referring to the safety of the community refers to the danger that *the defendant might engage in criminal activity to the detriment of the community*."  S. Rep. No. 98-147, at 39 (1983) (emphasis added; footnotes omitted); *see also United States v. Patriarca,* 948 F.2d 789, 792–793 (1st Cir. 1991).

Under the Bail Reform Act of 1984, detention of a defendant is required if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The government is required to demonstrate, by a preponderance of the evidence, that a defendant poses a risk of flight or, by clear and convincing evidence, that he is a danger to the community. United States v. Patriarca, 948 F.2d 789, 792–793 (1st Cir.1991). In considering the government's motion to detain the defendant, the Court must determine whether any condition or combination of conditions will reasonably assure "the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).[12]

In making the determination for both grounds, the Court must consider the factors set out in 18 U.S.C. § 3142(g), which include the nature and circumstances of the offense charged; the weight of the evidence against defendant; defendant's character, financial resources, past conduct, and criminal history; and the nature and seriousness of the danger to any person or the community that would be posed by defendant's release. The factors set forth in 18 U.S.C. § 3142(g), compel defendant's detention on both dangerousness and risk of flight.

I.  **THE DEFENDANT IS A DANGER TO THE COMMUNITY AND A RISK OF FLIGHT**

From the violent nature of the current charges, the defendant's extremely violent criminal history, and his violation of numerous historical probationary sentences, consideration of each

---

[12] As noted by the Senate Judiciary Committee: "This reference to safety of any other person is intended to cover the situation in which the *safety of a particular identifiable individual, perhaps a victim or witness*, is of concern, while the language referring to the safety of the community refers to the danger that *the defendant might engage in criminal activity to the detriment of the community*." S. Rep. No. 98-147, at 39 (1983) (emphasis added; footnotes omitted); *see also* United States v. Patriarca, 948 F.2d 789, 792–793 (1st Cir.1991).

and every factor supports detention of the defendant, and demonstrates that no conditions can assure the safety of the community, or assure the defendant's appearance..

### A.     NATURE AND CIRCUMSTANCES OF THE CHARGED OFFENSES

This is a crime of violence, and the charged crimes involve the use of multiple firearms against the employee of T-Mobile, and police, and were extremely violent. See Ex. 2, p. 6-7; Tr. 7-63.  Indeed, as the testimony of CW-1 makes clear, the Defendant fired his gun at the pursuing police officers, and the cruiser was at extremely close range.  See Exhibit 15, p. 40-42 (Stephan started shooting the police once or twice).  Moreover, the Defendant in fact struck Darius Carter with one of his shots.

The charges also carry significant potential sentences not only for the underlying crime of violence (Count 2),[13] but also the mandatory minimum of ten years consecutive to that offense, for the discharge of the firearm used in the offense.  Consequently, the nature and circumstances of the charged offenses and potential penalty weigh in favor of detention, and the insufficiency of any conditions of release.

### B.     WEIGHT OF THE EVIDENCE

The weight of the evidence also overwhelmingly supports detention.  See Exs. 2, 3, 4, 7. The defendant's clothing at the time of the arrest, largely matches what he wore during the robbery, including pants, sneakers, and underpants, though he had shed the mask, gloves and jacket.  Compare Ex. 2 and Ex. 7.  Put plainly, the defendant's pink/purple underpants observed

---

[13] Specifically, the government calculates the total offense level for the underlying crime of violence to be at least 32, and the defendant's criminal history to be category V. See USSG §§ 2B3.1(a) (base offense level 20); 2B3.1(b)(3)(D) (+3, victim suffered degree of injury between bodily injury and serious bodily injury); 2B3.1(b)(7)(B) (+1, loss amount $25,000); 3A1.2(c)(1) (+6, fired at officers during flight); 3C1.2 (+2, reckless endangerment during flight). As such, if convicted as charged, the defendant faces a potential guidelines sentence range of 188-235 months, followed by 120 months for the Section 924(c) conviction.

in both the surveillance video and during the booking video prove his involvement beyond a reasonable doubt.  The defendant has also litigated and lost a suppression motion, which only bolsters the government's anticipated availability of its proof at trial.

To be sure, the testimony of CW-1, if called as a witness, will likely face impeachment on the same basis that essentially every cooperating witness does, including prior inconsistent statements, and promises, rewards and inducements.  The government readily acknowledges this.  However, at this juncture, CW-1 has already pled guilty, and credibly testified at a trial, where he identified the defendant as being one of the robbers and firing at police.  See Ex. 15. The jury convicted the codefendant of conspiring with the defendant.  Accordingly, the weight of the evidence, now favorably tested before a jury, overwhelmingly favors detention of this defendant, who was proven at the codefendants trial to have been a shooter.

### C.     HISTORY AND CHARACTERISTICS OF THE DEFENDANT

This Court is also obliged to consider "person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."  18 U.S.C. 3142(g)(3)(A).

The defendant's criminal history includes armed robbery for which he served two years, animal cruelty for which he served one year, malicious destruction of property for which he served one year, receiving stolen property, assault and battery on a police officer, and resisting arrest.  See Exs. 8-14. Moreover, the "at the time of the current offense or arrest, the [defendant] was on" "release pending trial," 18 U.S.C. 3142(g)(3)(B), for a case out of the Dorchester District Court, alleging restating arrest, and malicious destruction of property (Criminal History, Docket 1807CR004034).  See United States v. Smith, No. 2:06 CR 35-5, 2007 WL 529966, at *1

(W.D.N.C. Feb. 14, 2007) (noting that whether a defendant was under release pending trial at the time the charged offense was committed is "of great concern" in pre-trial detention decisions).

Quite literally, even the prospect of a suspended sentence being imposed does not forestall the defendant from committing new crimes. Of note, a large proportion of his criminal history accrued after he was initially arraigned in District Court on the July 2015 armed robbery. See Exhibit 8, Docket 1507CR003153 (arraigned 8/17/15, pending under 8/17/17, when defendant arraigned in Superior Court). That case remained pending while the defendant accrued numerous arrests, including assault and battery on a police officer, and a conviction for animal cruelty, for which he was, surprisingly, given a suspended sentence on August 3, 2017, and placed on probation. Ultimately the July 2015 armed robbery was elevated to Superior Court and the Defendant pled guilty, receiving a two-year state prison term. See Ex. 9.

Nevertheless, despite this leniency, the defendant has continued to victimize others, committing more crimes and accruing new offenses, including felony larceny, witness intimidation, and domestic violence arrests in recent years. See e.g., Criminal History, Docket Nos. 1702CR003793, 1802CR000451. "The conclusion to be drawn from this record is that despite probationary sentences and prison sentences over the course of the past decade, the defendant continues to commit crimes." United States v. DaSilva, No. 13- 10017, 2013 WL 12212612, at *4 (D.Mass. Mar. 29, 2013); United States v. Daniells, No. CR 15-10150-GAO, 2017 WL 2256988, at *4 (D. Mass. May 23, 2017) (ordering pre-trial detention of a defendant charged with committing a crime while on release from another court)

The defendant has six prior defaults in both the various district courts, and Superior Court. Also of note is the fact that the defendant has defaulted on probation violation hearings with suspended sentences hanging over his head, and pending Superior Court matters. See e.g.,

Docket 1602CR002104 (default on probation hearing scheduled for 10/13/17 while on probation, and Superior Court case was pending as of 8/16/17).

To the government's knowledge, the defendant has no history of employment. Indeed, the defendant has been subject to three restraining orders, including one obtained by his mother, who is his proposed third party custodian. More disturbingly, the defendant has assaulted her and broken her property, and also committed other acts of domestic violence. See Ex. 16.

### D.   NATURE AND SERIOUSNESS OF DANGER POSED BY RELEASE

The evidence of the defendant's involvement in this armed robbery and shooting properly supports a determination that the defendant presents a serious danger if released. That this case is the defendant's fourth[14] robbery case demonstrates that if released more crimes, violence, and robberies will continue. In this regard, Congress has made clear that "an 'especially significant' danger to the community" is the risk that a defendant will continue to commit similar offenses while awaiting trial. United States v. Arroyo-Reyes, 3 F.3d 561, 1994 WL 440654, at *4 (1st Cir. 1994) (unpublished).

Furthermore, his violent criminal history of domestic violence and witness intimidation, past convictions for robbery and animal cruelty, and the violent offenses for which he is currently charged more than suffice to demonstrate the danger that this defendant poses. See Ex. 16. Indeed, the defendant has flagrantly violated every previously imposed probationary sentence through the commission of new and serious offenses. In sum, history has proven that

---

[14] See Exhibit 9, Docket 1784CR00545 (Suffolk Superior Court), Docket DL081101 (Dorchester Juvenile Court unarmed robbery); Criminal History, Docket DL07D0699 (Dorchester Juvenile Armed Assault with Intent to Rob).

no conditions of release can curtail the danger presented by this defendant, or assure his appearance at court.[15]

## CONCLUSION

The defendant presents a significant danger to the community, a serious risk of flight, and a serious risk of obstructing justice. No conditions can assure the safety of the community or his return to Court. As such, the defendant must be detained until trial, which is less than sixty days from now.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:   */s/ Philip A. Mallard*
      Philip A. Mallard
      Glenn A. MacKinlay
      Assistant U.S. Attorneys
      United States Attorney's Office
      1 Courthouse Way, Suite 9200
      Boston MA 02210
      617-748-3674

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard*
Philip A. Mallard
Assistant U.S. Attorney

Date: April 5, 2020

---

[15] See United States v. Carswell, 144 F.Supp. 2d 123, 138 (N.D.N.Y. 2001) ("elaborate conditions dependent upon good faith compliance are sometimes insufficient when a defendant's criminal history provides no basis for believing good faith will be forthcoming").